## STEVENS *v.* MARKS, NEW YORK SUPREME COURT JUSTICE.

No. 210.   Argued January 24, 1966.—Decided February 28, 1966.*

*Together with No. 290, *Stevens* v. *McCloskey, Sheriff,* on certiorari to the United States Court of Appeals for the Second Circuit.

*John P. Schofield* and *Eugene Gressman* argued the cause and filed briefs for petitioner in both cases.

*H. Richard Uviller* argued the cause for respondents in both cases. With him on the brief were *Frank S. Hogan* and *Michael R. Stack.*

Briefs of *amici curiae,* urging reversal, were filed by *Robert J. Eliasberg* and *Kenneth C. Eliasberg* for the Patrolmen's Benevolent Association of the City of New York, and by *Abraham Glasser* for the Superior Officers Council of the City of New York Police Department.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner, a member of the New York City Police Department, was summarily discharged on July 15, 1964. On June 26 he had been subpoenaed before a New

York County grand jury, known as the First June 1964 Grand Jury. Before appearing in the grand jury room, an Assistant District Attorney advised him to sign a waiver of immunity, saying that otherwise he would be subject to removal from public office.[1] He signed the waiver.[2] Thereupon he was an unsworn witness before the grand jury:

> "Q. Lieutenant . . . Stevens, as was pointed out to you earlier, this grand jury is inquiring into the

[1] Article I, § 6, of the New York Constitution provides in part: "No person shall be subject to be twice put in jeopardy for the same offense; nor shall he be compelled in any criminal case to be a witness against himself, providing, that any public officer who, upon being called before a grand jury to testify concerning the conduct of his present office or of any public office held by him within five years prior to such grand jury call to testify, or the performance of his official duties in any such present or prior offices, refuses to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant question concerning such matters before such grand jury, shall by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years from the date of such refusal to sign a waiver of immunity against subsequent prosecution, or to answer any relevant question concerning such matters before such grand jury, and shall be removed from his present office by the appropriate authority or shall forfeit his present office at the suit of the attorney-general."

[2] The waiver read in part:

". . . all benefits, privileges, rights and immunity which I would otherwise obtain from indictment, prosecution and punishment for or on account of, regarding or relating to any matter, transaction or thing, concerning the conduct of my office or the performance of my official duties, or the property, government or affairs of the State of New York or of any county included within its territorial limits, or the . . . official conduct of any officer of the city or of any such county, concerning any of which matters, transactions or things I may testify or produce evidence, documentary or otherwise, before the 1st, 1964 Grand Jury in the County of New York, in the investigation being conducted by said Grand Jury."

crimes of conspiracy to commit the crime of bribery of a public officer and the crime of bribery of a public officer; do you understand that?

"A. I do.

"Q. Do you understand further that you have been called here as a potential defendant, not as a witness; do you understand that?

"A. I do.

"Q. Do you understand that under the Constitution of the United States you have the right to refuse to answer any questions that might tend to incriminate you; do you understand that?

"A. I do.

"Q. Do you understand further that under the New York State Constitution, and New York City Charter, a public officer is required, if he desires to continue to hold his public position, to sign a limited waiver of immunity; do you understand that?

"A. I do.

"Q. Do you understand that that means that if you sign a limited waiver of immunity which requires you to answer questions concerning the conduct of your public office, that what you say will be taken down and recorded, and that should this grand jury vote a true bill against you, that is an indictment—to indict you for a crime, the testimony you give can and will be used against you. Do you understand that?

"A. I do.

"Q. Are you prepared to sign a waiver of immunity?

"A. I am."

That petitioner's waiver of "all benefits, privileges, rights and immunity which I would otherwise obtain

from indictment, prosecution and punishment" covered both the *privilege* against self-incrimination and *immunity* from prosecution [3] is evidenced by the foregoing colloquy.

Then petitioner was sworn, asked a few questions, given a questionnaire to fill out, and asked to return with it completed.

At these stages petitioner had no counsel. On July 15, he returned to a different grand jury—the Third July 1964 Grand Jury. Now he had counsel and refused to sign a waiver of immunity. He was examined, as before, concerning his knowledge that to save his job he had to waive his immunity. He acknowledged that he knew the consequences of his refusal to waive his immunity and was excused.

That same day, as a consequence of his refusal to waive immunity before the Third July 1964 Grand Jury, petitioner was discharged as a police officer.

On July 22 he was again summoned before the First June 1964 Grand Jury and put a certain question which he refused to answer on the basis of his state and federal [4] constitutional rights. He was brought before a judge who directed him to answer the questions. He refused to answer "on the grounds stated in the State and Federal Constitution" and the judge found him in contempt. On July 28, a hearing was held, at which petitioner, through his counsel, contended that the waiver was invalid or, alternatively, had been effectively withdrawn. In either

---

[3] This was the view of the Appellate Division which, when affirming petitioner's first contempt conviction, said: "[I]f the waiver of immunity is still valid, petitioner no longer has any privilege to refuse to testify." 22 App. Div. 2d 683, 684, 253 N. Y. S. 2d 401, 402.

[4] *Malloy* v. *Hogan*, 378 U. S. 1, holding that the Fourteenth Amendment guaranteed a witness the protection of the Fifth Amendment's privilege against self-incrimination, was decided June 15, 1964.

event his Fifth Amendment claim was valid under *Malloy* v. *Hogan,* 378 U. S. 1. For it was agreed that "there is no claim that this witness has been given immunity." [5] At the conclusion of the hearing, petitioner was fined $250 and given 30 days in the civil jail in New York City for that contempt. Petitioner promptly appealed to the Appellate Division of the New York Supreme Court. While this appeal was pending, he sought and was denied federal habeas corpus. *Application of Stevens,* 234 F. Supp. 25. The Appellate Division dismissed the appeal, stating its belief that *Regan* v. *New York,* 349 U. S. 58, was controlling.[6] 22 App. Div. 2d 683, 253 N. Y. S. 2d 401. The New York Court of Appeals denied leave to appeal. 15 N. Y. 2d 483, 205 N. E. 2d 315. This is the conviction which is the basis of the petition in No. 210.

---

[5] Petitioner's counsel made the following statement: "May we also have the record clarified, Your Honor. It is my understanding, based on what was said here the last time in court before Your Honor, that there is no claim that this witness has been given immunity. The claim is that he has signed a valid waiver and that he refused to testify under it, and that is why Your Honor has found him guilty of criminal contempt, is that right?" The court replied, "That covers the situation."

[6] *Regan* v. *New York* arose under an earlier version of the New York immunity law, which conferred *automatic* immunity from prosecution on anyone who testified before the grand jury. Regan had, like petitioner, executed a waiver of immunity and later sought to repudiate it. Unclear of his rights, Regan refused to testify though ordered to do so. This Court affirmed his contempt conviction, refusing to consider questions raised as to the validity of his waiver and the efficacy of his efforts to withdraw it. The Court's theory was that regardless of the validity of the waiver, Regan was bound to answer the questions put to him: If the waiver was valid and binding, then of course he must answer since he had waived the right to refuse to do so. If the waiver was invalid, then petitioner would have immunity from prosecution, and thus could not rely on the privilege against self-incrimination.

Thereafter, on September 28, petitioner was summoned again before the First June 1964 Grand Jury. Once again a question was put him and once more he refused to answer, claiming his privilege which, as we have said, was available to him under *Malloy* v. *Hogan, supra,* if the waiver was invalid or had been effectively withdrawn. He was brought before another judge who directed him to answer the question. On refusal, petitioner was held in contempt and fined $250 and sentenced to 30 days in jail.[7] On January 11, 1965, petitioner was once more summoned before the First June 1964 Grand Jury and refused again to answer a question on the ground that it was incriminating. He was taken before a judge and directed to answer. On his refusal he was fined $250 and sentenced to 30 days. While serving that jail term, petitioner once again sought a writ of habeas corpus in the United States District Court. The court denied relief, indicating that it regarded *Regan* v. *New York, supra,* binding authority. *United States ex rel. Stevens* v. *McCloskey,* 239 F. Supp. 419. The Court of Appeals for the Second Circuit affirmed. 345 F. 2d 305. It is this last conviction that is the basis of petitioner's application for a writ of habeas corpus in No. 290.

Both cases are here on writs of certiorari. 382 U. S. 809.

Not once in any of the hearings was petitioner told that if he responded with incriminating answers, the state immunity statute might preclude a prosecution based on such answers. On the contrary, the Assistant District Attorney made it clear that the view of the prosecution was that petitioner had waived any rights he might have had under the immunity statute:

> "Q. And was it further told to you that it meant that if you signed a limited waiver of immunity,

---

[7] This sentence was served.

which required you to answer questions concerning your conduct in public office, that what you said would be taken down and recorded and that should this grand jury vote a true bill against you, that is an indictment, the testimony you gave could be and will be used against you? Was that explained to you?

"A. I believe it was, yes, sir.

"Q. And did you tell this grand jury you understood that?

"A. That's right."

The Assistant District Attorney went on to say:

"Q. And do you understand further that regardless of what your lawyer may say or what anyone else may say, that it is the contention of the People that this is a valid waiver of immunity and that you do not have immunity? Do you understand that?

"A. Yes, sir."

As we read this record, petitioner was led to believe that he could invoke his federal privilege against self-incrimination only on pain of losing his public employment; that to retain his job he was obliged to sign a waiver; and that should he sign a waiver he would have no immunity in answering incriminating questions. Throughout the various appearances petitioner made before the grand juries and in the New York courts which held him in contempt, the prosecution consistently maintained that petitioner's waiver was valid. And there was never any suggestion that if, as petitioner contended, the waiver *were* invalid or effectively withdrawn, he might obtain a valid immunity from subsequent prosecution.

Here lies the difference between this case and *Regan* v. *New York*. For after that case arose, New York amended its immunity statute. Instead of conferring automatic immunity on all witnesses who testify before

the grand jury, immunity is now conferred "only by strict compliance with the procedural requirements of · our immunity statutes properly enacted . . . ." *People* v. *Laino,* 10 N. Y. 2d 161, 173, 176 N. E. 2d 571, 579. Section 381 of the Penal Law, as amended in 1953,[8] provides that in any bribery investigation "the court, magistrate or grand jury, or the committee may confer immunity in accordance with the provisions" of § 2447. The latter section provides that an investigating grand jury is among those "authorized to confer immunity" in a proceeding relating to bribery, provided that certain procedural steps are taken: (a) the witness must refuse to answer on the ground of self-incrimination; (b) the grand jury must then be "expressly requested by the prosecuting attorney to order such person to . . . answer"; (c) the grand jury must then order the person to answer; (d) the witness must then comply with the order to answer; and (e) thereupon "immunity shall be conferred." Under these laws, immunity is not automatically conferred "merely by testifying." *People* v. *Laino, supra,* at 172, 176 N. E. 2d, at 578. "Complete immunity from prosecution may be obtained by a prospective defendant, or any witness, only by strict compliance with the procedural requirements of our immunity statutes properly enacted . . . or by virtue of immunity provisions in our State Constitution . . . ." *Id.,* at 173, 176 N. E. 2d, at 579.

In the present case neither the prosecutor nor the grand jury had any thought of conferring immunity on petitioner. They tried to hold petitioner to his waiver. Yet if he had gone ahead and testified and it were established in a later prosecution that his waiver was invalid, it seems that he would have been bereft of

---

[8] See *Regan* v. *New York,* 349 U. S. 58, 59, note 2 and accompanying text, for a discussion of the earlier version of that section.

any immunity under the New York law, since the requirements of "strict compliance" had not been met.[9] Accordingly, only if the petitioner's waiver was valid and binding was he bound to testify—at least until the affirmative steps necessary to confer immunity were taken. Whether or not petitioner could validly assert the privilege against self-incrimination depends on whether the waiver was, as he contends, invalid or effectively withdrawn. Although the trial judge which first found him in contempt ruled that the waiver was valid, the Appellate Division considered that question irrelevant in light of *Regan* v. *New York.*

Since, as we have seen, *Regan* is inapposite, we conclude that at the time petitioner was held to be in contempt, he had—as a matter of federal constitutional law—effectively withdrawn the waiver. When petitioner was asked to waive his federally secured right to refuse to answer the questions, he was informed that failure to execute the waiver would result in the loss of his public employment. Although it put petitioner to "a choice between the rock and the whirlpool" (*Frost Trucking Co.* v. *Railroad Comm'n*, 271 U. S. 583, 593), New York says that, having "voluntarily" waived his constitutional rights, petitioner may not thereafter claim his privilege. At petitioner's first appearance before a grand jury after having consulted with counsel, petitioner attempted to do just that: he announced his intention to withdraw his waiver.

Even were we to assume, without deciding, that a State may constitutionally exact, on pain of loss of employment and in the absence of counsel, the waiver of a constitutional right, we would be unable to find any justifi-

---

[9] That immunity was never properly conferred on petitioner was, as we read this record, recognized by petitioner's counsel and by the judge which first found him in contempt of court. See note 5, *supra*, and accompanying text.

cation for denying the right to withdraw it.[10]  We hold that petitioner's effort to withdraw the waiver was effective, and that in the absence of an immunity provision clearly made applicable to him, petitioner could properly stand on his privilege and refuse to answer potentially incriminating questions.

One final point remains.  Although the courts below did not consider the possibility, the briefs suggest that petitioner might, quite apart from the statutory immunity conferred by § 2447, have been given immunity by operation of law.  It is said that, as the New York courts have interpreted the state constitution, a potential defendant may not be compelled to appear before a grand jury; any testimony given by him during such an appearance may not thereafter be used against him.  *People* v. *Steuding,* 6 N. Y. 2d 214, 160 N. E. 2d 468; *People* v. *Laino,* 10 N. Y. 2d 161, 176 N. E. 2d 571.  Thus it might be thought that this "automatic" immunity resulting from petitioner's appearance before the grand jury makes this case precisely identical with *Regan.*  We cannot agree.  We need not stop to determine whether the immunity said to be conferred here—which merely prevents the use of the defendant's testimony or its fruits in any subsequent prosecution but, apparently, does not preclude prosecution based on "independent" evidence (*People* v. *Laino, supra; People* v. *Ryan,* 11 App. Div. 2d 155, 204 N. Y. S. 2d 1)—constitutes that "absolute immunity against further prosecution" about which the Court spoke in *Counselman* v. *Hitchcock,* 142 U. S. 547, 586, and which the Court said was necessary if the

---

[10] As for the suggestion that withdrawal of the waiver in mid-hearing poses an administrative inconvenience, we only note that there was no such inconvenience here.  Petitioner had answered only a few perfunctory questions at his first appearance before the grand jury.  He asserted his desire to withdraw the waiver immediately upon returning before the grand jury.

privilege were to be constitutionally supplanted. And see *Albertson* v. *Subversive Activities Control Board,* 382 U. S. 70, 79–81. For even if the *Steuding-Laino* immunity were available to petitioner, he was led to believe—as we have already seen—that *no* immunity provisions were applicable to his case.

In this sense the case is very close to *Raley* v. *Ohio,* 360 U. S. 423, where the existence of immunity was never suggested to the witnesses, later held in contempt. In that case the State Supreme Court held that the immunity under the statute was automatically available to the witnesses and advice of the investigating agency was not necessary. But we reversed those judgments of conviction since what the State was doing was "convicting a citizen for exercising a privilege which the State clearly had told him was available to him" (*id.*, at 438), and we went on to say:

> "A State may not issue commands to its citizens, under criminal sanctions, in language so vague and undefined as to afford no fair warning of what conduct might transgress them. *Lanzetta* v. *New Jersey,* 306 U. S. 451. Inexplicably contradictory commands in statutes ordaining criminal penalties have, in the same fashion, judicially been denied the force of criminal sanctions. *United States* v. *Cardiff,* 344 U. S. 174. Here there were more than commands simply vague or even contradictory. There was active misleading. Cf. *Johnson* v. *United States,* 318 U. S. 189, 197. The State Supreme Court dismissed the statements of the Commission as legally erroneous, but the fact remains that at the inquiry they were the voice of the State most presently speaking to the appellants. We cannot hold that the Due Process Clause permits convictions to be obtained under such circumstances." *Id.*, at 438–439.

*Raley* demonstrates that the State may not substitute for the privilege against self-incrimination an intricate scheme for conferring immunity and thereafter hold in contempt those who fail fully to perceive its subtleties. A witness has, we think, a constitutional right to stand on the privilege against self-incrimination until it has been fairly demonstrated to him that an immunity, as broad in scope as the privilege it replaces, is available and applicable to him.[11] This, it seems to us, is the teaching of *Raley,* and accordingly the *Steuding-Laino* immunity—if otherwise applicable—cannot now be invoked to validate these contempt convictions.

*Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

Proper disposition of these cases is rendered more difficult because of seeming confusion that has attended them all along the line. In the courts below the significance of an important New York statutory amendment was apparently overlooked. This Court granted certiorari limited to a question which, in my view, the record does not present and which the Court does not answer.[1] The judgments below are now reversed on different

---

[11] The suggestion that we should remand the case to the New York courts for a finding of whether or not petitioner was misled is, we think, wide of the mark. A State must affirmatively demonstrate to the witness that a valid immunity from prosecution is his before it may hold him in contempt for refusing to answer questions that would otherwise be incriminating. Whether the State has met its burden must be measured at the time of the alleged contempt. A declaration that there was a valid immunity uttered for the first time on appeal would come too late.

[1] Certiorari was limited to the question whether a law is unconstitutional which requires the discharge and bars the rehiring of any public officer who refuses to sign a waiver of immunity and claims his privilege against self-incrimination. 382 U. S. 809.

grounds never properly set forth by petitioner. With this background, a good case could be made for dismissing the writs as improvidently granted. However, I believe briefing and argument have brought to the fore errors sufficiently plain to warrant setting aside these judgments, although my analysis differs from the Court's and I consider that a remand, and not an outright reversal, is called for.

It is common ground that petitioner cannot be jailed for refusing to incriminate himself unless either he waived his federal privilege against self-incrimination, or immunity adequate to offset that privilege was conferred upon him. Taking up the first possibility— waiver of the privilege against self-incrimination—it seems to me evident that petitioner was never asked to sign, nor did he sign, a waiver of that privilege. What the New York Constitution and the New York City Charter explicitly require be signed, and what petitioner did in terms sign, is a waiver of immunity from criminal prosecution, that is, a waiver not of the federal privilege but of the state immunity that may be granted to circumvent the privilege.[2] That a waiver of the privilege and a waiver of immunity may both often lead a witness to incriminate himself is no reason to blur these two different legal concepts. A State in exacting a waiver of the privilege should turn square corners; New York did not ask for nor did it obtain a waiver of the privilege in

---

[2] N. Y. Const., Art. I, § 6, requires "a waiver of immunity against subsequent criminal prosecution" and the New York City Charter, § 1123, requires that one "waive immunity from prosecution." The document signed by petitioner stated that he waived "all benefits, privileges, rights and immunity which I would otherwise obtain from indictment, prosecution and punishment . . . ." N. Y. Penal Law § 2446 states that where any law provides that a person shall not be prosecuted because of his testimony or that testimony he gives shall not be used against him, that person may file a statement "expressly waiving such immunity or privilege."

this instance, so that basis for justifying the contempt convictions is out of the case. The only other basis is a claim that New York has conferred immunity upon petitioner adequate to replace the privilege.

Before turning to that issue, it should be noted that there can be no reason to consider now whether petitioner's purported waiver of immunity was ineffective or withdrawn. If the Court is right in saying that no statutory immunity was ever conferred and that immunity under the state constitution cannot now be relied on by New York because of *Raley* v. *Ohio,* 360 U. S. 423, then it is hardly necessary to decide if this never-conferred immunity was adequately waived or the waiver effectively withdrawn. If New York did properly confer adequate immunity and so offset the privilege, then under *Regan* v. *New York,* 349 U. S. 58, it is irrelevant at this stage whether petitioner has or has not lost the benefits of that immunity through waiver since he is obliged to testify in either event. Adequacy or withdrawal of a waiver of the privilege against self-incrimination might sometimes be relevant at this stage, but no waiver of the privilege was even attempted in this instance as I have noted above. On this phase of the case, it only remains for me to demur to the Court's statement that "we would be unable to find any justification for denying the right to withdraw" the waiver (pp. 243–244, *ante*). New York has the very deepest interest in uprooting and punishing misconduct by its officials; it also has a narrower interest in having an investigation, commenced on the premise of a waiver, not suddenly balked by the witness' change of heart. It seems to me there is no federal constitutional reason why a witness who has properly given a voluntary waiver either of his privilege or his immunity should not be held to it.

Turning now to the conferral of immunity as a means of offsetting the privilege and justifying these convic-

tions, I agree with the Court that the pertinent New York statute quite plainly is no longer an automatic immunity statute and that it was not brought into play in this instance. While further consideration on this score should not be foreclosed on the remand which for reasons later indicated I believe should take place here, *People* v. *Laino,* 10 N. Y. 2d 161, 176 N. E. 2d 571, seems fairly persuasive that this literal construction of the statute is accurate.[3] Disregarding the statute then, the convictions can stand only if immunity adequate to offset the privilege flowed from the state constitution and if petitioner was not misled in his reliance on the privilege. For reasons now set forth, I believe these questions should be decided only after a remand to the state courts.

As construed in *Laino,* the New York Constitution gives automatic immunity only against use of compelled testimony and its fruits, 10 N. Y. 2d, at 173, 176 N. E. 2d, at 579, and the Court today leaves undecided the question whether this immunity is sufficient to supplant the privilege. While the reference to "absolute immunity against further prosecution" in *Counselman* v. *Hitchcock,* 142 U. S. 547, 586, may point toward a negative answer, I agree that the question ought not be decided until it is necessarily presented after a full briefing and argument by the parties. It is perhaps reason

---

[3] In *Laino* the New York Court of Appeals stated that immunity under the state statutes could be acquired only "by strict compliance with the procedural requirements . . . ." 10 N. Y. 2d, at 173, 176 N. E. 2d, at 579. N. Y. Penal Law § 2447, governing the procedure for conferring statutory immunity, provides that in the case of a grand jury, the grand jury must be "expressly requested" by the prosecutor to order the witness to answer and the grand jury must give that order; there appears to have been neither request nor order in this case. That courts might "estop" the prosecutor from later prosecuting in these circumstances should not be taken as the deliberate, assured grant of immunity the Constitution requires.

enough for postponement that the negative answer would perforce invalidate one or more federal statutes which protect only against later use of compelled testimony.[4] In addition, this Court has recently extended the Fifth Amendment to the States, *Malloy* v. *Hogan,* 378 U. S. 1, and abolished the "two sovereignties" rule, *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, so that an expansive reading of the privilege could have a far more serious impact than was true in the days of *Counselman.*[5] In any event, the question need not be reached if *Raley* v. *Ohio,* 360 U. S. 423, governs the instant case.

As I read *Raley,* it holds that the State may not lead witnesses into believing that no immunity provisions are applicable and then, when the witnesses stand on their privilege, hold them in contempt on the ground that immunity provisions supplanted the privilege. In this case the Court apparently believes that statements of the prosecutor and trial court led petitioner to think that no immunity provisions applied to him even contingently; if this is so, then I would agree the State cannot now rely on the state constitution, or the state statute for that matter, to negative petitioner's privilege. However, there are no findings on how petitioner understood the statements made to him and they are certainly susceptible of quite a different interpretation. It may well be that the State meant, and was understood by the petitioner, to convey only that it believed petitioner's waiver of immunity to be valid and irrevocable so that it would attempt to prosecute him on the basis of any testimony he gave. On this reading, it is quite possible

---

[4] See, *e. g.,* 49 U. S. C. § 9 (1964 ed.) See generally *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 104, n. 6 (concurring opinion of MR. JUSTICE WHITE).

[5] A number of States appear to provide immunity no greater than that implied by the New York Constitution. See, *e. g.,* Ariz. Rev. Stat. Ann. § 13–384; Conn. Gen. Stat. § 12–2.

that both the State and petitioner believed that adequate immunity provisions were generally applicable to the extent of supplanting the privilege and that petitioner would be shielded at a later trial if the State there proved to be wrong in its views on waiver.[6]   If so, and assuming the state constitution does in law provide adequate immunity, then petitioner was obliged to testify under *Regan* and was not relevantly misled.[7]   The present record was not formulated with regard to the *Raley* problem, that issue was not briefed in its present form, and it seems to me wrong to decide the point without a remand.

I would vacate both judgments and remand the case to the state courts [8] so the State may there try to establish that apart from a possible waiver adequate immunity was conferred, and so that petitioner may try to show that he was misled on this score.

---

[6] It should be noted that nothing in the record indicates that petitioner raised the *Raley* argument in the lower courts, and that case was not even cited in his petitions for certiorari.

[7] In a footnote, the Court appears to announce as a new and distinct principle that "[a] State must affirmatively demonstrate to the witness that a valid immunity from prosecution is his" before overriding the privilege (p. 246, n. 11, *ante*).   Reading the words "valid immunity" literally, the statement is simply inconsistent with *Regan*. If instead the Court means that immunity—albeit contingent on the invalidity of a waiver—must be "affirmatively demonstrated," regardless of whether the State misled the witness and regardless of whether the witness well knew he had contingent immunity, then I disagree with that proposition which is not supported by *Raley*.

[8] The case to be so remanded is No. 210; No. 290, which originated in the Federal District Court as a habeas corpus suit should be returned there to await the outcome of any further state proceedings.